UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MAK AUTOMATION, INC.,                    )
                                         )
            Plaintiff(s),                )
                                         )
      vs.                                )          Case No. 4:08CV413 JCH
                                         )
G.C. EVANS SALES AND                     )
   MANUFACTURING COMPANY, INC.,          )
                                         )
            Defendant(s).                )

## MEMORANDUM AND ORDER

This matter is before the Court upon Plaintiff's Motion for Summary Judgment (Doc. No. 32)

and Defendant's Motion for Summary Judgment (Doc. No. 29). Both motions are fully briefed and

ready for disposition.

## BACKGROUND

Plaintiff MAK Automation, Inc. ("MAK") is a Missouri Corporation with its principal place

of business in Chesterfield, Missouri (Defendant's Statement of Uncontroverted Material Facts

("DSUMF"), Doc. No. 34, ¶ 3; Plaintiff's Uncontroverted Statement of Facts in Support of Its

Motion for Summary Judgment ("PSUMF"), Doc. No. 35, ¶3). Terry Kuc is the President of MAK

and owns all of MAK's shares of stock. (DSUMF, ¶ 4; PSUMF, ¶ 2). MAK is engaged in the

business of marketing and soliciting industrial packaging and processing food and beverage equipment

within the State of Missouri and throughout the country. (PSUMF, ¶ 4). Defendant G.C. Evans

Sales & Manufacturing Co., Inc. ("GC Evans") manufactures and markets equipment used in the food

and beverage processing industry. (DSUMF, ¶ 1). GC Evans is an Arkansas corporation with its

principal place of business in Little Rock, Arkansas. (DSUMF, ¶ 1). GC Evans has no offices in

Missouri. (DSUMF, ¶ 2).

In September 2004, Kuc and Ken Langenbeck, GC Evans' sales manager, began discussing MAK marketing GC Evans' products. (DSUMF, ¶ 5; PSUMF, ¶ 6). The initial discussions primarily involved MAK's solicitation of Anheuser-Busch ("AB") on behalf of GC Evans because AB was an existing customer of MAK. (DSUMF, ¶ 5; PSUMF, ¶ 7).

On February 1, 2005, Langenbeck and Kuc met at GC Evans' offices in Little Rock, Arkansas to discuss the possibility of MAK becoming an independent sales representative for GC Evans. (DSUMF, ¶ 8; PSUMF, ¶ 9). Langenbeck and Kuc also discussed MAK marketing GC Evans' products to AB and other clients. (DSUMF, ¶ 9). Langenbeck agreed to let MAK act as a broker on behalf of GC Evans. (PSUMF, ¶ 10; DSUMF, ¶¶ 12-14). Langenbeck and Kuc understood that this would be a non-exclusive arrangement and the parties did not discuss a specific geographic territory. (DSUMF, ¶ 9).

The parties had no written contract and, thus, the precise terms of their agreement are unclear. (Doc. No. 34-26, p. 7). Both parties agree that, under the terms of their February 1, 2005 agreement (hereinafter "commission sales agreement"), MAK had to generate or procure the sale to be entitled to a commission on a sale of GC Evans' equipment. (DSUMF, ¶ 11). Plaintiff specifically alleges that "[t]he agreement and contract between Plaintiff and Defendant provided, *inter alia*, that the Defendant shall pay Plaintiff ten-percent (10%) commissions on all sales arising out of, and/or as a result of, Plaintiff's contacts, efforts, and activities as a sales representative." (Complaint ("Compl."), Doc. No. 1, ¶ 5; PSUMF, ¶ 10). GC Evans asserts that it only agreed to accept quotations from MAK for prospective sales on a per quote basis. (DSUMF, ¶ 14).

### A.   Whitlock Packaging Transaction

Whitlock Packaging Corporation ("Whitlock") is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. (DSUMF, ¶ 16). Beverage companies supply their product

to Whitlock. (Id.) Whitlock, in turn, puts the product into cans or bottles and returns the finished product to the beverage companies for distribution. (Id.) Whitlock has facilities in several locations, including Florida, Oklahoma and New Jersey, but none in Missouri. (DSUMF, ¶ 17). David Alexander was Whitlock's Wharton, New Jersey plant general manager from 1996 until November 11, 2005. (DSUMF, ¶ 18). At the relevant time, Alexander did not have purchasing authority for Whitlock's Fort Gibson, Oklahoma plant, had limited purchasing authority for Whitlock's Lakeland, Florida plant, and had purchasing authority for the Wharton, New Jersey plant. (DSUMF, ¶¶ 19, 39). Whitlock's Paul Kennedy and John McNamee had purchasing authority for its Fort Gibson, Oklahoma facility. (DSUMF, ¶¶ 19, 39).

### B.    Whitlock's Wharton, New Jersey Order

On February 1, 2005, Langenbeck sent Kuc an e-mail and attached a quote that GC Evans had previously provided to Kennedy for a cooling tunnel at Whitlock's Fort Gibson, Oklahoma facility. (DSUMF, ¶ 20). Langenbeck asked Kuc to find out if the project still was alive. (DSUMF, ¶ 20).[1] In May 2005, Mark McNamer, GC Evans' Vice President of Sales and Marketing, telephoned MAK and told Kuc that GC Evans would be building a new cooling tunnel for Quaker and suggested that Kuc contact his associates at Whitlock to set up an inspection of the tunnel. (DSUMF, ¶ 23). Kuc invited Kennedy (of Whitlock's Oklahoma facility) to view the new cooling tunnel. (Id.) Kennedy invited Alexander (of Whitlock's New Jersey facility) to join him and McNamee to attend

---

[1]Kuc had a meeting scheduled with Whitlock around this time, but it appears that no progress was made on that account until May 2005. (DSUMF, ¶¶ 20-22).

the meeting at GC Evans on July 12, 2005.  (DSUMF, ¶ 26).[2]  Prior to the July 12, 2005 meeting, Alexander had no interactions or personal dealings with MAK or Kuc.  (DSUMF, ¶ 27).

During the July 12, 2005 meeting in GC Evans' Little Rock offices, Alexander stated that Whitlock's New Jersey and Florida facilities might need cooling tunnels.  (DSUMF, ¶¶ 33-34). Alexander attested that he informed those attending the meeting that any equipment for the New Jersey facility would be purchased through him and that he would deal with GC Evans directly and not through an independent sales representative, including MAK. (DSUMF, ¶¶ 35-37).[3]  Alexander claimed that his general practice was to deal with the manufacturer directly and not to utilize an independent sales representative.  (DSUMF, ¶ 38).  In July 2005, Alexander had general purchasing authority only for Whitlock's New Jersey facility, and he had some authority for new lines at Whitlock's Florida "Juice Bowl" facility.  (DSUMF, ¶ 39).[4]

On July 20, 2005, Kuc e-mailed Alexander regarding the specifications for the cooling tunnel they had discussed during the July 12, 2005 meeting.  (DSUMF, ¶ 42).  Alexander responded with sizing for a cooling tunnel for a "size 12'x60', Package is 1 gallon PET bottle."  (DSUMF, ¶ 42). Alexander attested that his e-mail referred to Whitlock's Florida "Juice Bowl" facility.  (DSUMF, ¶ 42).[5]  Whitlock's Juice Bowl facility is the only facility that utilizes one-gallon PET bottles.

---

[2]Plaintiff asserts that "the July 12, 2005 meeting was scheduled and planned specifically so that Dave Alexander could attend."  (Plaintiff's Response to DSUMF, Doc. No. 37, ¶ 27). Plaintiff cites to the affidavit of Terry Kuc to support this statement.  (Id.)

[3]Kuc stated that he does not recall any statements made by Alexander regarding this topic. (Plaintiff's Response to DSUMF, ¶¶ 35-37).

[4]Kuc stated that it was his "understanding that Dave Alexander['s] participation in the meeting was in his capacity as corporate director of engineering for Whitlock Packaging.  His participation was not limited only to Whitlock's Wharton, New Jersey facility."  (Plaintiff's Response to DSUMF, ¶ 39).

[5]Plaintiff claims that the 12'x60' cooling tunnel was for the Wharton, New Jersey plant and cites to Alexander's deposition for support.  (Plaintiff's Response to DSUMF, ¶ 42 (citing

- 4 -

(DSUMF, ¶ 42). Kuc then e-mailed GC Evans' McNamer requesting a quote for Alexander for a cooling tunnel with the size 12'x60', Package is 1 gallon PET Bottle. (DSUMF, ¶ 43).

According to Defendant, Alexander provided Langenbeck with the specifications for the proposed cooling tunnel for Whitlock's New Jersey facility. (DSUMF, ¶¶ 45-46). In early November 2005, GC Evans' McNamer provided several quotes to Alexander for a 10'x48' cooling tunnel. (DSUMF, ¶¶ 47, 49). Alexander rejected the first two quotes but accepted GC Evans' third quote. (DSUMF, ¶¶ 48, 50, 51).[6] Alexander does not recall communicating with Kuc or MAK, either by telephone or e-mail, about the New Jersey cooling tunnel at any time prior to November 15, 2005, when Alexander accepted GC Evans' offer. (DSUMF, ¶ 56).[7]

A few weeks prior to the cooling tunnel's completion, Alexander returned to GC Evans' facility in Little Rock, Arkansas to inspect the cooling tunnel. (DSUMF, ¶¶ 59-60). The cooling tunnel was installed at Whitlock's New Jersey facility in late Spring or early Summer 2006. (DSUMF, ¶ 61).

GC Evans discussed giving MAK a 5% commission if the final sales price for the Whitlock cooling tunnel allowed a commission. (DSUMF, ¶ 77). GC Evans claims that it wanted to gain good

---

Deposition of David Alexander, Exhibit 3, page 25)). The page cited by Plaintiff clearly states that Alexander testified, "[t]hose specification were for the requirements at the Juice Bowl plant."

[6]The third quote from GC Evans was the lowest quote Alexander received by $15,000 to $20,000. (DSUMF, ¶ 51).

[7]On October 27, 2005, Kuc sent GC Evans an e-mail stating that he had a telephone conversation with Alexander that morning, and Alexander advised Kuc that he was expecting two proposals from GC Evans by the end of the week. (DSUMF, ¶ 57; Plaintiff's Response to DSUMF, ¶ 57). Alexander does not recall this conversation. (Id.) McNamer sent an e-mail to Kuc notifying him that the proposals would be sent to Alexander by Monday. (Id.) Kuc forwarded this message to Alexander. (Id.) Alexander does not recall receiving this e-mail. (Id.)
On November 1, 2005, Kuc sent Alexander an e-mail asking him to acknowledge their water supply for the cooling tunnels in order to complete Whitlock's order. (DSUMF, ¶ 58; Plaintiff's Response to DSUMF, ¶ 58). There is no record of Alexander responding to this e-mail. (Id.)

will from MAK in order to obtain opportunities with AB. (DSUMF, ¶¶ 77-78). The ultimate purchase price paid by Whitlock, however, did not support a commission, and none was provided to MAK. (DSUMF, ¶ 78).

### C. Truesdale Cooling Tower

On or around February 8, 2006, GC Evans sold a cooling tower to a Coca-Cola bottling facility, Truesdale Packaging ("Truesdale"), in Missouri. (DSUMF, ¶ 82; Compl., ¶ 14). MAK did not participate in any meetings discussing the cooling tower, did not obtain any specifications from Truesdale , and did not inspect the cooling tower for Truesdale . (DSUMF, ¶¶ 86-88).

MAK claims that it is entitled to a commission on the cooling tower because it solicited and procured the sale of other GC Evans equipment to Truesdale. (PSUMF, ¶ 14). On or about June 19, 2006,[8] GC Evans paid MAK a 10% commission on the sale of a cooling tunnel to Truesdale. (PSUMF, ¶ 15; Defendant's Responses to PSUMF, Doc. No. 39, ¶ 15; DSUMF, ¶ 90).[9] MAK claims that it solicited Truesdale's business, obtained the specifications for the projects from Truesdale, obtained proposals from GC Evans, procured purchase orders from Truesdale, attended meetings with Truesdale, and inspected the equipment prior to shipping and scheduled the delivery of the equipment. (Id.) Although MAK was not involved in the negotiation, sale or distribution of the cooling tower, Kuc testified that MAK is entitled to a commission on the cooling tower because

---

[8]According to Defendant's timeline of events, the sale of the cooling tower (for which Defendant paid Plaintiff a commission) and the cooling tunnel (for which Defendant did not pay Plaintiff a commission) occurred just a few months apart from each other.
      On July 18, 2009, Defendant terminated the sales commission agreement. (Compl., ¶ 19).

[9]Defendant asserts that MAK did not procure the sale of any equipment to Truesdale Packaging in Missouri. Instead, Defendant states that, with respect to the cooling tower, "GC Evans had already issued a quotation to the Coca-Cola plant in Truesdale prior to GC Evans' relationship with MAK," and that "GC Evans had already turned over its existing quote to MAK with the hope that MAK would successfully be able to sell GC Evans' equipment" to AB. (Defendant's Response to PSUMF, ¶ 14).

"[t]he cooling tower would have never been purchased if the cooling tunnel hadn't been purchased, so it was a component of the sale." (Doc. No. 34-26, p. 5). MAK was not aware of the sale of the cooling tower until after its relationship with GC Evans ended. (Doc. No. 34-26, p. 5). GC Evans claims that the cooling tower was a completely separate transaction from the cooling tunnel and MAK is not entitled to a commission for the cooling tower. (DSUMF, ¶ 90).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex

Corp., 477 U.S. at 331, n.2. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.


# DISCUSSION

## I.  INTRODUCTION

Plaintiff alleged claims for lost commissions for the sale of a cooling tunnel for Whitlock's New Jersey facility and a cooling tower for Truesdale's Missouri facility. Plaintiff also alleges that it is entitled to attorneys' fees and costs pursuant to Missouri statute.[10]

In response, Defendant asserts that Plaintiff was not the procuring cause of either Whitlock's purchase of the cooling tunnel or Truesdale's purchase of the cooling tower. In addition, Defendant argues that Missouri law does not apply to Plaintiff's causes of action under a choice of law analysis.[11]

---

[10]Mo. Rev. Stat. § 407.912 provides, in relevant part:
2. Nothing in sections 407.911 to 407.915 shall be construed to impair a sales representative from collecting commissions on products or services ordered prior to the termination of the contract between the principal and the sales representative but delivered and accepted by the purchaser after such termination.
3. When the contract between a sales representative and a principal is terminated, all commissions then due shall be paid within thirty days of such termination. Any and all commissions which become due after the date of such termination shall be paid within thirty days of becoming due.

Mo. Rev. Stat. § 407.913 provides:
Any principal who fails to timely pay the sales representative commissions earned by such sales representative shall be liable to the sales representative in a civil action for the actual damages sustained by the sales representative and an additional amount as if the sales representative were still earning commissions calculated on an annualized pro rata basis from the date of termination to the date of payment. In addition the court may award reasonable attorney's fees and costs to the prevailing party.

[11]In Plaintiff's Motion for Summary Judgment, it asks the Court to hold that Missouri law is applicable to its causes of action.

## II.    CHOICE OF LAW

When deciding choice-of-law issues, the district court sitting in a diversity action generally applies the choice-of-law rules of the forum state. Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH, 495 F.3d 582, 585 (8th Cir. 2007); Stricker v. Union Planters Bank, 436 F.3d 875, 877 (8th Cir. 2006) ("In a diversity action, a district court sitting in Missouri follows Missouri's choice-of-law rules to determine applicable state law."). Missouri has adopted the Restatement (Second) Conflicts of Law to decide choice-of-law questions. See Viacom, Inc. v. Transit Cas. Co., 138 S.W.3d 723, 724-25 (Mo. 2004). As recognized by the Defendant, Section 188 of the Restatement (Second) applies to the present action where the contract did not include a choice-of-law provision.[12]    Section 188 "is a multi-factored test for assessing the contacts a state has with

---

[12]§ 188 Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

   (a) the place of contracting,

   (b) the place of negotiation of the contract,

   (c) the place of performance,

   (d) the location of the subject matter of the contract, and

   (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and

the parties and the underlying events in a case." St. Paul Fire & Marine Ins. Co. v. Bldg. Constr. Enters., 526 F.3d 1166, 1168 (8th Cir. 2008).

In Plaintiff's Motion for Summary Judgment, Plaintiff argues that Missouri law applies to its causes of action. (Doc. No. 32). Plaintiff notes that Terry Kuc is the sole owner of MAK and all of MAK's business operations are based out of St. Louis County. In support of its claim that Missouri law should apply to the sales commission agreement, MAK outlines a series of e-mails sent by agents of GC Evans to Kuc at Kuc's office in Missouri.[13] (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiff's Memorandum"), Doc. No. 33, pp. 4-). MAK states that it solicited several Missouri customers on behalf of GC Evans, in addition to non-Missouri customers. (PSUMF, ¶ 12). MAK notes that it forwarded various proposals and quotations from MAK's Missouri office to Pepsi Americas, Truesdale Packaging, Boulevard Brewing and Whitlock Packaging. (Plaintiff's Memorandum, p. 4).

With respect to the Whitlock transaction, Plaintiff claims that it performed the following activities within Missouri: scheduling sales meetings between MAK, Whitlock and GC Evans, following up with Whitlock, obtaining specifications from Whitlock, reviewing and transferring proposals and quotations, scheduling an inspection for Whitlock and receiving confirmations from GC Evans that it would pay MAK's commissions. (Plaintiff's Memorandum, p. 5). Plaintiff also outlines various activities within Missouri related to the sale of equipment to Truesdale, including soliciting business, obtaining proposals and quotations, attending meetings, coordinating inspections

---

203.

[13]Plaintiff, however, fails to note that these e-mails likely originated from GC Evans' facility in Arkansas.

and shipping, and participating in the installation of the equipment at the Truesdale facility. (Plaintiff's Memorandum, p. 4).

Both parties agree that the commission sales agreement between GC Evans and MAK was negotiated (in some form) on February 1, 2005 in Arkansas. (Memorandum in Support of Defendant's Motion for Summary Judgment ("Defendant's Memorandum"), Doc. No. 30, p. 11). The parties have presented no evidence of any meetings between GC Evans and MAK in Missouri regarding the commission sales agreement. MAK admits that it solicited customers on behalf of GC Evans throughout the country, not just in Missouri. The GC Evans' equipment was built in and distributed from Arkansas. (Id.)

This Court finds that Arkansas law applies to this litigation where Plaintiff seeks payment pursuant to the commission sales agreement. The place of formation and negotiation of the commission sales agreement was clearly Arkansas. The subject matter of the agreement, the equipment, was produced in and distributed from Arkansas. The place of performance of the contract varied based upon the location of the customer. The Court acknowledges that MAK solicited customers in Missouri, including Truesdale. The Court finds that MAK's solicitation of customers outside of Missouri counterbalances this factor. Similarly, although MAK based its operations out of Missouri, GC Evans worked from Arkansas and conducted its communications and negotiations from there.

The Court believes that Arkansas has the most significant relationship to the dispute over the sales commission agreement. Accordingly, the Court applies Arkansas' state substantive law to Plaintiff's claims. Plaintiff's claims under the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.911-407.915 are, therefore, dismissed, and Plaintiff's Motion for Summary Judgment is denied. The Court, however, notes that there may be a similar statutory provision under Arkansas

law.  <u>See</u> Ark.Code Ann. §4-70-303 (2009)[14] and §4-70-306 (2009).[15]  Plaintiff is granted until October 9, 2009 to file an amended complaint conforming with this Court's order.

## III.    STANDARD FOR BROKER'S COMMISSION

Under Arkansas law,[16] the broker must be the procuring cause of the sale to be entitled to a commission.  <u>See</u> <u>Farm Credit Bank v. Miller</u>, 872 S.W.2d 376, 379 (Ark. 1994) (test is whether the broker was the "procuring, or efficient, cause of the sale"); <u>Atkins v. L.L. Cole & Son, Inc.</u>, 84 S.W.3d 899, 901 (Ark. Ct. App. 2002) (citing <u>Farm Credit Bank</u>, 872 S.W.2d at 379 )("[t]he 'procuring cause doctrine' can be used affirmatively to infer a contract between the broker and the principal by allowing the broker to show that his part of the contract was performed and the principal reaped a benefit, or defensively to prevent broker fraud").  "Showing a continuous course of conduct leading to the sale can mean that a broker is due a commission."  <u>Farm Credit Bank</u>, 872 S.W.2d at 379 (citing <u>Hatchett v. Story</u>, 252 S.W.2d 78, 79-80 (1952)). "[I]n the absence of an express contract between the broker and his principal, the implication generally is that the broker becomes entitled to

---

[14]Section 4-70-303 provides, "[i]f a compensation agreement between a sales representative and a principal that is not in writing is terminated, the principal shall pay all commissions due the sales representative within thirty (30) working days after the date of the termination."

[15]Section 4-70-306 provides, "[a] principal who ... fails to pay a commission as required by § 4-70-303 is liable to the sales representative in a civil action for three (3) times the damages sustained by the sales representative, plus reasonable attorney's fees and costs."

[16]The same standard applies under Missouri law.  <u>See</u> <u>Follman Properties Co. v. Daly</u>, 790 F.2d 57, 58 (8th Cir. 1986) (internal citations omitted) ("[W]here the terms are not fixed by special contract, the broker is not entitled to his commission unless he is the efficient procuring cause of the sale."); <u>Williams v. Enochs</u>, 742 S.W.2d 165, 167 (Mo. 1987); <u>Zabol v. Lasky</u>, 555 S.W.2d 299, 304 (Mo. 1977)("The rule is well established in Missouri that, unless provided otherwise by the terms of a broker's employment, he must prove, in a suit to recover a commission on a sale, that his acts with reference to that sale were the efficient or procuring cause of the sale."); <u>E.A. Strout Realty Agency, Inc. v. McKelvy</u>, 424 S.W.2d 98, 102 (Mo. Ct. App. 1968)("If a broker is not bound to obtain a binding contract to earn his commission, he may be said to have procured a buyer if he be the means of bringing the parties together or in communication with one another.").

the usual commission whenever he brings to his principal a party who is able and willing to take the property and enter into a valid contract upon the terms then named by the principal, although the particulars may be arranged and the matter negotiated and completed between the principal and purchaser directly." Holland v. Dietz, No. 79-113, 1979 Ark. LEXIS 1619, at *3 (Ark. Dec. 10, 1979).

## IV.    WHITLOCK SALE

MAK alleges that it is entitled to a commission on the sale of a cooling tunnel for Whitlock's Wharton, New Jersey facility. MAK alleges that it procured the sale of the Whitlock's New Jersey cooling tunnel and, pursuant to their oral agreement, is entitled to a ten percent commission therefrom.

The parties present conflicting evidence regarding who arranged for Alexander to attend the July 12, 2005 meeting and who procured the sale of the cooling tunnel. Plaintiff asserts that it arranged for Whitlock's Alexander to attend the July 12, 2005 meeting with Langenbeck at GC Evans' plant. Defendant asserts that Alexander's attendance at the July 12, 2005 meeting was mere happenstance because Plaintiff invited Alexander's colleague, Paul Kennedy, to the meeting.[17] Defendant notes that GC Evans' Langenbeck had a pre-existing relationship with Alexander, who

_____

[17]Under Defendant's version of the events, Kuc contacted Paul Kennedy of Whitlock's Fort Gibson, Oklahoma facility to schedule a meeting in Little Rock. Kennedy then invited his colleague, Alexander, to attend the meeting in Little Rock to view GC Evans' cooling tunnel. Defendant, with a supporting affidavit from Alexander, asserts that once Alexander arrived in Little Rock, Kuc had little to no influence in procuring the sale of the cooling tunnel to Whitlock's New Jersey facility. Upon arriving in Little Rock, Alexander claims that he informed Langenbeck and Kuc that he wanted to deal directly with Langenbeck and GC Evans, not any third party, including MAK. Thereafter, Alexander asserts that he only communicated with Kuc regarding the Florida "Juice Bowl" facility. Alexander negotiated and communicated solely with GC Evans regarding the price and installation of the Wharton, New Jersey cooling tunnel. Nevertheless, Defendant claims that it considered giving Plaintiff a commission for the sale of the cooling tunnel, purportedly to engender good will from Plaintiff for other sales.

negotiated the contract on behalf of Whitlock. (DSUMF, ¶ 66). On the other hand, Plaintiff points out that, prior to MAK acting as a broker on behalf of GC Evans, GC Evans never sold any equipment to Whitlock. (Plaintiff's Response to DSUMF, ¶ 30) ("The purpose of the meeting was to market and to establish Whitlock as a customer and purchase of G.C. Evans equipment for any of Whitlock Packaging's facilities.").

Thus, the determinative issue before the Court is whether MAK procured the sale of the cooling tunnel to Whitlock by arranging (although perhaps fortuitously) a meeting with Alexander and Langenbeck and by following-up with Alexander. Initially, as the parties had an oral contract, it is unclear what specifically was required of Plaintiff to earn a commission for the sale of goods on behalf of GC Evans. This Court finds that Plaintiff appears to be (at least) indirectly responsible for Alexander attending the July 12, 2005 meeting. A jury could find that setting up the meeting was sufficient under the commission sales agreement to earn a commission for Plaintiff. Further, a jury may find that the follow-up communications between Plaintiff and Alexander demonstrate continued contact that culminated in the sale of the cooling tunnel. Farm Credit Bank, 872 S.W.2d at 379. Finally, GC Evans' willingness to pay Plaintiff a commission supports a finding that there is a material factual dispute. (See Doc. No. 37-6).[18]

The Court believes the issue of whether Plaintiff earned a commission is fact intensive and cannot be determined as a matter of law. A jury must decide whether the terms of the oral sales commission agreement would permit a commission under the circumstances present here. The Court denies Defendant's Motion for Summary Judgment regarding the Whitlock cooling tunnel sale.

---

[18]In a November 22, 2005 e-mail to McNamer, Langenbeck states, "Mark: I spoke with Terry Kuc this AM. I advised him of the 5% commission on the Wharton Cooler. I told him that we were in a competitive situation and we had to give so he would have to give also." (Doc. No. 37-6).

## V.    TRUESDALE SALE

MAK asserts that it should receive a commission for the sale of a cooling tower to Truesdale because it previously received a commission for procuring the sale of a cooling tunnel to Truesdale. MAK's basis for his claim is that "[t]he cooling tower would have never been purchased if the cooling tunnel hadn't been purchased, so it was a component of the sale[.]" (Doc. No. 34-26, p. 5).

The parties do not dispute that GC Evans paid MAK a commission on the sale of a cooling tunnel to Truesdale in 2006.  (DSUMF, ¶ 90).[19]  The parties disagree regarding whether procuring the sale of the cooling tunnel to Truesdale entitles Plaintiff to a commission for the sale of a cooling tower to Truesdale.

The undisputed evidence presented to this Court demonstrates that MAK was not directly involved in any aspect of the Truesdale cooling tower sale.  In Kuc's deposition, he admitted that he did not provide the specifications for the cooling tower from Truesdale to GC Evans.  (Doc. No. 34-26, p. 2).  Kuc did not attend any meetings with anyone from Truesdale to discuss the cooling tower. (Doc. No. 34-26, pp. 2-3).  Kuc did not send any e-mails to anyone at Truesdale discussing the cooling tower.  (Doc. No. 34-26, p. 3).  Kuc never visited the GC Evans facility in Little Rock, Arkansas during the construction of the cooling tower.  (Doc. No. 34-26, p. 3).  Kuc did not participate in or oversee the installation of the cooling tower at the Truesdale plant in any manner. (Doc. No. 34-26, p. 3).  In fact, Kuc was unaware that the cooling tower was constructed until after the termination of his employment and the filing of this lawsuit.  (Doc. No. 34-26, pp. 3-4).

---

[19]Although Defendant claims that Plaintiff did not earn the commission.  See Defendant's Response to PSUMF, ¶ 14.

Thus, Plaintiff is seeking a commission for the sale of the cooling tower solely based upon his prior assistance in the sale of the cooling tunnel to Truesdale's plant during the same year. The parties dispute what was required for Plaintiff to earn a commission under the oral sales commission agreement. Although Plaintiff was not involved in the negotiations for the Truesdale cooling tower, the Court finds that the mere proximity of the sales to Truesdale of the cooling tunnel and the cooling tower may be sufficient to establish Plaintiff's entitlement to a broker's commission. Thus, a jury must determine whether Plaintiff would be entitled to a commission for the cooling towner based upon its prior representation on behalf of GC Evans to Truesdale. The Court denies Defendant's motion for summary judgment with respect to the Truesdale commission.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 29) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. No. 32) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff shall file its amended complaint no later than **October 9, 2009**.

Dated this 25th day of September, 2009.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE